**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION**

| | | |
|---|---|---|
| RICHARD SARKISSIAN, | * | |
| Plaintiff, | * | |
| v. | | Civil Action No. AW-04-995 |
| | * | |
| VATICOR, INC., | | |
| | * | |
| Defendant. | | |
| | * | |

* * * * *

**MEMORANDUM OPINION**

This action involves a suit brought by Richard Sarkissian ("Plaintiff" or "Sarkissian") against Vaticor, Inc. ("Defendant" or "Vaticor") for various claims related to Sarkissian's employment at Vaticor. In response, Vaticor has filed an Amended Answer denying liability and asserting a variety of counterclaims against Sarkissian. Currently pending before the Court is Defendant's Motion for Summary Judgment [7], in which Vaticor seeks dismissal of Plaintiff's Complaint in its entirety and summary judgment with respect to its counterclaims. The Court has reviewed the entire record, as well as the Pleadings with respect to the instant motion. No hearing is deemed necessary. *See* Local Rule 105.6 (D.Md. 2004). For the reasons stated below, Defendant's Motion for Summary Judgment will be granted in part.

**I.   FACTUAL & PROCEDURAL BACKGROUND**

On June 1, 2001, Sarkissian was hired as a "Senior Network Consultant" by Vaticor, an information technology company that "provides IP infrastructure solutions, including software and consulting and professional services, to Fortune 1000 companies." Vaticor's offer letter, which Sarkissian countersigned, provided that he would be paid an annual salary of $90,000 and entitled

1

to stock options, health insurance, fifteen days of paid leave, reimbursement for "all reasonable business expenses," and a variety of other benefits. The letter noted that Vaticor's "cash compensation program" consisted of two components: base salary and an annual "Company Success Sharing Program," the latter defined as a bonus program through which payments were awarded based on individual performance and "company performance against key business objectives." No mention of overtime pay was contained in the letter or in the emails that were exchanged between Sarkissian and Vaticor prior to Vaticor's formal offer of employment. The offer letter also described Vaticor's policy regarding unused vacation time, noting that employees were permitted to either carry over five unused days to the following year or cash those days out at year's end.

While employed by Vaticor, Sarkissian spent the bulk of his time performing services on behalf of J.P. Morgan Chase ("JPMC"), a large financial investment company and one of Vaticor's most significant clients. The nature of the work performed by Sarkissian remains in considerable dispute between the parties. Vaticor has described it as "providing advanced DNS, DHCP and IP Address Management design, implementing IP infrastructure software, providing training services and software support, and third-level computer support/problem resolution"; Sarkissian has suggested that he was essentially a "help desk" worker who "answer[ed] narrow how to questions from employees . . . about how to connect their computers with the computer system maintained by the Bank."

What is not in dispute, however, is that in order to fulfill his responsibilities, Sarkissian was required to travel extensively. During the approximately two-and-a-half years that he was employed by Vaticor, Sarkissian traveled widely within the United States and made numerous trips abroad, visiting, among other places, São Paulo, London, Paris, Sydney, Singapore, Bangkok, and Hong

Kong. In order to pay for his travels, Sarkissian made extensive use of a corporate American Express card, incurring tens of thousands of dollars in charges. Vaticor evidently experienced considerable difficulty in its efforts to reconcile Sarkissian's expenditures with his receipts and expense reports; by September of 2003, Vaticor's senior managers openly questioned charges they viewed as dubious and asked Sarkissian to clarify and resubmit his expense reports, which were described as "less than professional." Sarkissian was reminded of Vaticor's Travel and Expense policy and urged to be more meticulous in preparing his reports. Sarkissian, for his part, attributed any inaccuracies in his expenses to the rigors of his hectic schedule and constant travel, noting in an email to his superiors that "I am under pressure here with dates and timelines. I am doing all the work here. . . . I get less than 4 hours sleep sometimes. . . . I am not trying to hide anything. If questions do come up, I am prepared to discuss this line by line."

On January 12, 2004, Sarkissian abruptly resigned from Vaticor, announcing that he was leaving the next day. Also on January 12, Vaticor received a letter from Sarkissian's counsel, alleging that Sarkissian had been constructively discharged and that he was owed overtime pay, vacation pay, unpaid salary, and reimbursement for credit card charges. On January 27, 2004, Sarkissian filed suit in the Circuit Court for Montgomery County, Maryland. This case was removed to this Court on March 25, 2004.

Sarkissian brought claims of breach of contract, fraud, negligent misrepresentation, tortious interference, and violations of the Fair Labor Standards Act and the Maryland Wage and Hour Law. On January 21, 2005, this Court granted Vaticor permission to amend its Answer to state a variety of counterclaims, among them theft/misappropriation, conversion, unjust enrichment, and breach of contract. Vaticor now moves for Summary Judgment, arguing that there exists no genuine dispute

of material fact and that it is entitled to judgment as a matter of law. That motion is ripe, and the Court now issues this opinion.

## II.  STANDARD

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment will be granted when no genuine dispute of material fact exists and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511 (1986); *Haavistola v. Cmty. Fire Co. of Rising Sun, Inc.*, 6 F.3d 211, 214 (4th Cir. 1993); *Etefia v. East Baltimore Comm. Corp.*, 2 F. Supp. 2d 751, 756 (D.Md. 1998). "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555 (quoting Fed.R.Civ.P. 1). The court must "draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded to particular evidence." *Masson v. New Yorker Magazine*, 501 U.S. 496, 520, 111 S.Ct. 2419, 2435 (1991) (internal citations omitted). While the evidence of the non-movant is to be believed and all justifiable inferences drawn in his or her favor, a party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences. *See Deans v. CSX Transp., Inc.,* 152 F.3d 326, 330-31 (4th Cir. 1998); *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985).

## III.  ANALYSIS

Plaintiff's Complaint states claims of breach of contract, fraud, negligent misrepresentation, tortious interference, and violations of the Fair Labor Standards Act ("FLSA") and the Maryland Wage and Hour Law ("MWHL") with respect to overtime pay. However, in his Opposition to

4

Defendant's Motion for Summary Judgment, Plaintiff voluntarily dismisses his fraud, negligent misrepresentation, and tortious interference claims, as well as his breach of contract claim for credit card charges that Vaticor ultimately reimbursed.[1] Remaining are Plaintiff's claims for vacation and overtime pay and Defendant's various counterclaims. In its Motion for Summary Judgment, Defendant argues that Plaintiff has failed to present evidence sufficient to sustain his claims, that there are no genuine issues of material fact, and that Defendant is entitled to judgment as a matter of law. For reasons set forth below, Defendant's Motion for Summary Judgment will be denied with respect to Plaintiff's claim for vacation pay, granted with respect to Plaintiff's claims for overtime, and denied with respect to Defendant's counterclaims.

A.   **Vacation Pay**

Sarkissian claims that he was improperly divested of annual leave he had accumulated while employed by Vaticor. When Sarkissian joined Vaticor, in June 2001, its leave policy provided that

---

[1] Plaintiff's Complaint also alleges that he is owed $7,500 for "two missed paychecks." (Pl's Compl. ¶ 21.) There is some confusion over whether Plaintiff has conceded this claim. On April 2, 2004, Vaticor sent Plaintiff three checks: one for payment of alleged business expenses that Plaintiff had accumulated on his personal and corporate credit cards; one compensating Plaintiff for his final two weeks of work; and one compensating Plaintiff for his work from July 16 - July 31, 2003. (Def.'s Ex. 21.)

Plaintiff has acknowledged that his credit card charges were paid off and that he is no longer pursuing that particular claim; however, with regard to the "missing" paychecks, Plaintiff states, somewhat ambiguously, that Defendant's assertion that the paycheck claim has been withdrawn is "not consistent with the undersigned's recollection" and that Defendant "cites nowhere in this record where such an abandonment of the missing paychecks is documented." (Pl.'s Resp. in Opp'n to Def.'s Mot. for Summ. J. at 3.)

Despite this indirect suggestion that Plaintiff has not abandoned his claim to the paychecks, Plaintiff offers absolutely no argument as to why, in light of the four weeks' worth of salary sent to him by Defendant in April 2004, his claim to the two paychecks should not be dismissed. In addition, Defendant has cited documents exchanged during discovery in which Plaintiff states that "[t]he only claims still left in this matter relate to vacation time and overtime." (Pl.'s Objs. and Other Resps. to Req. for Prod. at 5.) Accordingly, the Court find that Defendant is entitled to summary judgment with respect to Plaintiff's claims for unpaid salary.

5

mid-level employees such as Sarkissian could accumulate a "pool" of fifteen days of paid time off. If an employee had not exhausted his or her leave by the end of the year, he or she was permitted to either (a) carry over a maximum of five days into the following year, or (b) exchange up to five unused days for their cash equivalent. Sarkissian acknowledged this policy when he signed Vaticor's offer letter. (Def.'s Mot. for Summ. J., Ex. 3.) Sarkissian also signed an Employee Acknowledgment Form that reserved to Vaticor the right to change its policies at any time. (*Id.*, Ex. 4.) In January 2003, Vaticor's leave policy was revised to no longer allow employees to "cash out" unused leave; employees could still, however, carry over five days into the following year. Sarkissian acknowledged this revision with his signature. (*Id.*, Ex. 7.) On November 21, 2003, Vaticor altered its policy once again, informing employees by email that vacation days could no longer be carried over. (*Id.*, Ex. 8.) That same day, Sarkissian was individually contacted in an email offering to "work together to ensure . . . that you are taken care of in terms of days off." (*Id.*) Yet, somewhat contradictorily, that same email discouraged Sarkissian from actually using his vacation days, noting that "[w]e can't afford to have you take this much time off at the end of the year" and that "Vaticor is at a critical stage in the companies [sic] life and we need to ensure that there are no hiccups in terms of revenue." (*Id.*) Subsequently, in an email exchange that took place during the last week of the 2003, Sarkissian's supervisor inquired as to the days he would be taking off. Sarkissian responded that he would not be taking any time off. (*Id.*, Ex. 9.)

Sarkissian's Complaint states that he and Vaticor "had a contract which required it to pay him for such accrued but unused annual leave." (Pl.'s Compl. ¶ 15.) Sarkissian does not expressly state the number of days' worth of leave he believes was contractually owed him, although it appears

from his Complaint that he is stating a claim for the equivalent of two weeks of leave.[2] This claim is flawed. To the extent that Sarkissian bases his breach of contract claim on the terms expressed in Vaticor's offer letter, that letter specifically provided that Sarkissian was entitled to "carry over" or "cash out" a maximum of *five* days of leave. The letter, therefore, does not support Sarkissian's apparent claim that he is entitled to compensation for *fourteen* days of accrued but unused leave. Vaticor is correct to argue that, at most, five days are at issue here.

Vaticor goes further, however, arguing that Sarkissian was not entitled to any compensation whatsoever for his accumulated leave. Vaticor states that it "had a legal right" to change its policy to eliminate leave carry-over, and that it did so with Sarkissian's "knowledge and consent." (Def.'s Mot. for Summ. J. Ex. 3.) The Court agrees that Vaticor had the right to change the terms of employment between itself and Sarkissian, because the nature of the business relationship between them was always one of employment at-will. In Maryland, employment at-will creates an employment contract of indefinite duration. *Suburban Hosp., Inc. v. Dwiggins*, 324 Md. 294, 303 (Md. 1991). The doctrine also provides that, subject to certain narrow exceptions, an employment contract "may be terminated legally at the pleasure of either party at any time." *Adler v. American Standard Corp.,* 291 Md. 31, 35 (Md. 1981). Although there is no Maryland case precisely on point, there is authority from other jurisdictions that an employer's prerogative to terminate an at-will employee includes the right to unilaterally modify the terms of that employee's prospective

---

[2] The Court reaches this conclusion by comparing the monetary relief sought by Sarkissian for his unpaid leave ($3,750) with the relief he separately requests for four weeks of salary ($7,500) and noting that it is half the amount. In addition, in an email sent to Sarkissian on November 21, 2003, his supervisor noted, "I know you have about 14 days vacation left this year." (Def.'s Mot. for Summ. J., Ex. 8.)

7

compensation. *See, e.g.*, *Cotter v. Desert Palace, Inc.*, 880 F.2d 1142, 1145 (9th Cir. 1989) ("An employer privileged to terminate an employee at any time necessarily enjoys the lesser privilege of imposing prospective changes in the conditions of employment."); *Green v. Edward J. Bettinger Co.*, 608 F. Supp. 35, 42 (E.D. Pa. 1984) ("The undoubted right to terminate an at-will contract necessarily includes the right to insist upon changes in the compensation arrangements as a condition of continued employment."). *See also Elliott v. Board of Trustees*, 104 Md. App. 93, 104 (Md. Ct. Spec. App. 1995) ("an employer is free to modify unilaterally the contractual relationship that it had previously established with its employees as a result of an employee manual."). By continuing to work, an employee is deemed to indicate his consent to the modification. *See Smithson v. Juby*, 32 Va. Cir. 412, 416 (Va. Cir. Ct. 1994). However, the obvious corollary to this doctrine is that while *prospective* compensation may be freely diminished, an employer may not unilaterally modify or terminate benefits that had already accrued. *See Brett v. City of Eugene*, 130 Ore. App. 53, 58 (Or. Ct. App. 1994) ("accrued leave . . . is a vested interest that may not be touched.").

Sarkissian addresses this prospective/retrospective distinction, noting that "as to annual leave not yet earned, an employer may with proper notice inform employees that in the future annual leave will be subject to a use it or lose it condition." (Pl.'s Resp. at 2-3.) Sarkissian asserts, however, that in the present case, he "had already accumulated his annual leave and Defendant is attempting to take it from him. That is a different issue." (*Id.* at 3.) This characterization of Vaticor's actions, however, somewhat overstates the case; Vaticor did not summarily divest Sarkissian of his accumulated leave, but rather changed its policy so that Sarkissian could no longer carry five days

of leave into the following year.³ In doing so, however, Vaticor *unquestionably diminished the value of a benefit that Sarkissian had already accrued.* To any rational employee, five days of leave that may be used this year *or* the next are worth more than five days of leave that may *only* be used this year; by unilaterally converting Sarkissian's accrued leave from the former to the latter, Vaticor effectively reduced the value of his vested compensation. Although Vaticor may not have, as Sarkissian suggests, *eliminated* his accumulated leave, Vaticor plainly *modified* it to his detriment. Retroactive modification of an accrued benefit is not a right encompassed within the power of an at-will employer to change its workers' terms of employment. *See Brett*, 130 Ore. App. at 58 ("already accumulated leave . . . is a protected, vested property interest[] that may not be unilaterally modified"); *Paniagua v. City of Galveston*, 995 F.2d 1310, 1313 (5th Cir. 1993) ("That an employment contract is terminable at-will . . . does not mean that an employer can promise to pay an employee a certain wage and then unilaterally decide to pay the employee less for work she has already done."). Financial markets have long recognized that the *option* to buy or sell a good at a specified price is itself a thing of value; similarly, Sarkissian's option to carry five days of his accumulated leave into 2004 was not worthless, and, once that "option" had vested, it became an interest that Vaticor could not summarily eliminate. Accordingly, Vaticor's Motion for Summary Judgment with respect to Sarkissian's leave-related breach of contract claim will be denied.

**B.     Unpaid Overtime**

The Fair Labor Standards Act ("FLSA") requires employers to pay their employees time-

---

³If, for example, Vaticor had announced its new policy on December 31, Sarkissian could reasonably claim that his leave had been "taken from him," because then he would have had no opportunity to use his paid time off, and, pursuant to the new policy, no right to carry any of it forward to the following year.

and-a-half for work in excess of forty hours a week. 29 U.S.C. § 207(a)(1). The FLSA also provides that certain categories of employees are exempt from overtime requirements. 29 U.S.C. § 213. One of the exemptions is for computer professionals, who are defined in the FLSA as:

> any employee who is a computer systems analyst, computer programmer, software engineer, or other similarly skilled worker, whose primary duty is—
>
> (A) the application of systems analysis techniques and procedures, including consulting with users, to determine hardware, software, or system functional specificiations;
>
> (B) the design, development, documentation, analysis, creation, testing, or modification of computer systems or programs, including prototypes, based on and related to user or system design specifications;
>
> (C) the design, documentation, testing, creation, or modification of computer programs related to machine operating systems; or
>
> (D) a combination of duties described in subparagraphs (A), (B), and (C) the performance of which requires the same level of skills, and who, in the case of an employee compensated on an hourly basis, is compensated at a rate of not less than $27.63 an hour.

29 U.S.C. § 213(a)(17). The Department of Labor has recently issued regulations for determining whether an employee is a computer professional that mirror the standard set forth in Section 213(a)(17). *See* 29 C.F.R. § 541.400.

Vaticor argues that Sarkissian, hired as a "Senior Network Consultant" at a salary of $90,000 per year, plainly falls within the computer professional exemption; in support of its claim, Vaticor offers Sarkissian's resume, which describes him as "[a]n experienced network engineer, network management and internetworking professional with over 16 years of experience specializing in architecture and integration, analysis, optimization, design, implementation and support of enterprise

systems solutions" and "[a] skilled project manager of numerous successful projects" with "considerable experience in mentoring of junior staff." (Def.'s Mot. for Summ. J., Ex. 11.) Vaticor cites from a portion of Sarkissian's resume listing, among others, the following accomplishments:[4]

- Designed and implemented the entire IT infrastructure merging with Bank One and JPMorgan Chase & Company
- Infrastructure design, support and maintenance of Internal and External DNS
- Managing server consolidations world-wide and decommission of NT platforms to Unix
- Handling of daily third-level support for Asia and Latin American locations
- Implementing and testing Disaster Recovery and Business Continuity testing
- Management and roll-out of Cisco's VoIP Phones using

---

[4] Vaticor does not directly address the fact that the portions of Sarkissian's resume it cites are drawn from a section with the heading "Strategic Staffing Solutions - January 2004 To Present." Strategic Staffing Solutions is the technology consulting company that Sarkissian joined immediately following his resignation from Vaticor; in fact, the resume in question actually omits all mention of Vaticor, falsely stating that Sarkissian was employed by the Windward Consulting Group from February 1997 to June 2003, when the evidence clearly demonstrates that he was terminated by Windward in April 2001 and employed by Vaticor from June 2001 to January 2004.

More strangely, this resume was allegedly sent to Strategic Staffing Solutions on January 8, 2004, while Sarkissian was still employed by Vaticor; therefore, it can't possibly describe work done for Strategic Staffing Solutions, and can most reasonably be viewed as a summary of work that had already been performed on Vaticor's behalf. Nonetheless, this puts Vaticor in the somewhat delicate position of arguing that the Court should, for purposes of determining the type of work Sarkissian that performed, rely on a resume that concededly contains inaccuracies with respect to when, and for whom, that work may have been executed.

Despite this implicit contradiction, the Court agrees that Sarkissian's resume may still serve as "the best tool for evaluating his duties and background, because it was produced for his future employers, as opposed to being prepared by Mr. Sarkissian during litigation in an attempt to avoid dismissal of his claims." (Def.'s Rep. Br. at 4 n.2.) In addition, other evidence demonstrates that Sarkissian was hired by Strategic Staffing Solutions to continue the work he had been performing for Vaticor's client J.P. Morgan Chase, offering further indication that the list of accomplishments at the head of Sarkissian's resume actually comprises work performed for Vaticor and its clients. Accordingly, the Court finds that, despite being misleading in several respects, Sarkissian's resume contains a description of the work he performed while employed by Vaticor and will be treated as such.

Lucent's QIP IP Software

*Id.* In addition, Vaticor has submitted an affidavit from its President, Mark Anthony, stating that Sarkissian was "a highly-skilled computer professional" whose work "involved the design, development, documentation, analysis, creation, testing and modification of computer programs," that Sarkissian's resume accurately depicts his duties and responsibilities while employed by Vaticor, and that, prior to being retained by Vaticor, Sarkissian had been told that he would be paid on a salaried basis and that he was an "exempt" employee under federal and state wage laws. (*Id.*, Ex. 1.)

In support of his claim that he was a non-exempt employee, Sarkissian has submitted an affidavit in which he states that he was essentially a help-desk worker whose "job was to assist employees of the Bank who were having trouble with their computer addresses on the Bank's system or having trouble connecting to internal web based programs." (Pl.'s Resp. in Opp'n to Def.'s Mot. for Summ. J., Ex. 1 ¶ 2.) Sarkissian states that he responded to employees' calls and emails, installed software ("which consisted of inserting CD discs and following the instructions for the various programs involved," *Id.*), and "would also on occasion teach trainees how to use the QIP software," which was "strictly a matter of teaching them how to follow the instructions the software came with." *Id.* Sarkissian also quotes verbatim from Section 213(a)(17), which contains the FLSA's definition of a computer professional, and denies that he performed the types of duties described therein.

Within this Circuit, there does not appear to be any guidance as to the interpretation of Section 213(a)(17)'s "computer professional" exemption. A recently decided case from the Southern District of New York, however, offers a thorough analysis of Section 213(a)(17) under

12

facts and circumstances similar to those of the case at hand. In *Bobadilla v. MDRC*, 2005 U.S. Dist. LEXIS 18140 (S.D.N.Y. 2005), the plaintiff was a computer networking administrator who sued his former employer, alleging that he was entitled to overtime pay under the FLSA. The defendant employer argued that, contrary to plaintiff's assertions that he was "merely" a help desk employee, he was in fact a highly skilled computer professional, exempted from overtime requirements by Section 213(a)(17).[5] *Id.* at *18-19. The court granted summary judgment to the defendant, noting initially that plaintiff's salary was significantly higher than the amount paid to help desk personnel. *Id.* at *21. The court found that even though the plaintiff claimed to have spent most of his time performing help desk functions, "Bobadilla was principally of value to [his employer] because he had sophisticated knowledge of computing that went beyond that of a non-exempt Help Desk employee . . . ." *Id.* at *22. The court also relied heavily on the plaintiff's resume in evaluating the nature and sophistication of his work, noting that the resume "describes a number of sophisticated duties and responsibilities that he performed at MDRC, which fall well within the primary duties of a computer employee specified in Section 213(a)(17)." *Id.* at *25. After considering all of the evidence, the court concluded that the plaintiff performed highly-skilled work for his employer and was therefore an exempt employee under Section 213(a)(17). *Id.* at *29.

In the present case, the evidence also demonstrates that Sarkissian performed sophisticated computer work for Vaticor and its clients, rendering him an exempt employee under Section

---

[5]In addition, the defendant employer argued that the plaintiff also met the "administrative employee" exemption, which applies to "any employee employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1). Because the court rested its decision on the "computer employee" exemption of Section 213(a)(17), it did not find it necessary to reach the issue of whether the plaintiff was also an "administrative employee" under Section 213(a)(1).

13

213(a)(17). Under the FLSA, the burden of proving that an employee falls within the stated exemption rests with the employer, and the exemption is to be construed narrowly against the employer who seeks to assert it. *See Bohn v. Park City Group, Inc.*, 94 F.3d 1457, 1461 (10th Cir. 1996). The Court finds that Vaticor has met that burden here.

First, an examination of Sarkissian's resume belies his claim that he "worked on a 'help desk' answering narrow how to questions." (Pl.'s Resp. at 11.) According to his own resume, Sarkissian, among other accomplishments, "[m]anaged and coordinated the successful upgrade from Lucent's QIP 5.0 Sp3 to QIP 6.0 SP1 Globally for JPMorgan Chase & Company," "[d]esigned and implemented the entire IT infrastructure merging with [sic] Bank One and JPMorgan Chase & Company," "[d]esigned and taught Lucent Technologies VitalQIP IP Management software training for Global Network staff at JPMorgan Chase & Company," and performed the "[m]anagement and roll-out of Cisco's VoIP Phones using Lucent's QIP IP Software." (Def.'s Mot. for Summ. J., Ex. 11.) These actions appear to constitute the "design, development, documentation, analysis, creation, testing, or modification of computer systems and programs . . . based on and related to user or system design specifications" described in Section 213(a)(17)(B). In addition, according to an email he sent while negotiating new employment, Sarkissian "had a very important roll [sic]" at Vaticor, worked "on very high level projects," and was "the only one that is QIP Certified and a Certified Instructor not to mention part of the development team of Vigil-IP." (Def.'s Mot. for Summ. J., Ex. 13.)

In light of the foregoing evidence, Sarkissian's affidavit, which consists primarily of conclusory legal assertions, is simply inadequate to create a genuine dispute of material fact. A "mere scintilla of proof . . . will not suffice to prevent summary judgment; the question is not whether

14

there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party resisting summary judgment." *Peters v. Jenney*, 327 F.3d 307, 304 (4th Cir. 2003) (citing *Anderson v. Liberty Lobby*, 477 U.S. at 251) (internal quotation marks omitted). A reasonable jury could not find that Sarkissian, who was hired as a "Senior Network Consultant" at a salary of $90,000 per year and provided with a corporate credit card that he used to travel around the world and entertain clients, was simply a "help desk" employee. Sarkissian argues that he "did exactly the same kind of work" as the plaintiff in *Martin v. Indiana Michigan Power Co.*, 381 F.3d 574 (6th Cir. 2002), whom the court found not to be an exempt computer professional under Section 213(a)(1).[6] The work performed by Martin was described as follows:

> When people at the plant have problems with their computers, they call the help desk where the help desk employees put the problems into a database as "help desk tickets," which Martin prints out. Martin responds to these help desk tickets. He goes to the location indicated where he attempts to determine the nature of the problem, to "troubleshoot" it to determine how to proceed, and to repair the problem if possible. Martin installs software, such as Microsoft's Office 97, on individual workstations. He troubleshoots Windows 95 problems and installs provided software patches.

*Id.* at 577. Sarkissian clearly did not perform "exactly the same kind of work" as Martin. Martin worked at a fixed location, printing out help desk tickets and performing basic computer troubleshooting; Sarkissian traveled the globe and provided "level 3" technical support, meaning that two lower levels of support would have to be exhausted before his expertise was called upon. Martin installed basic operating system software and patches; Sarkissian designed and implemented IT infrastructures, managed world-wide server consolidations, and devised a software training program.

---

[6]*Martin* was decided prior to the enactment of the computer employee exemption of Section 213(a)(17); in its place, the court relied upon Section 213(a)(1)'s general professional employee exemption, read in conjunction with the computer professional exemption set forth in 29 CFR § 541.3 (which has since been amended).

15

Martin wore "a blue short-sleeved work shirt with two pockets on the front, a name badge that says 'Tony,' and a badge that says 'D.C. Cook, CSS Section'; blue work pants; and work boots," *id.* at 578; an email sent by Sarkissian notes that, when cream apparently exploded in his suitcase while he was on a business trip in Asia, he "had to clean all 6 suits/ties and shirts." (Def.'s Mot. for Summ. J., Ex. 25.)  Additionally, Martin had no computer certifications, had taken one class in using Windows 2000, and had four weeks' worth of hands-on computer training, *id.*; Sarkissian holds nearly a dozen computer certifications and cites expertise with numerous operating systems, software packages, and networking protocols.

Furthermore, even if a substantial portion of the work performed by Sarkissian was, as alleged in his affidavit, low-level and non-exempt, the Court finds that Sarkissian's "primary duties" at Vaticor fell within the primary duties of a computer employee as specified in Section 213(a)(17). "Primary duty" means the "principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700.  While "the amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee," "[t]ime alone . . . is not the sole test," and the court must consider, among other factors, "the relative importance of the exempt duties as compared with other types of duties." *Id.*  Although a thorough accounting of how Sarkissian spent his working hours is not present in the record, it appears that he devoted significant amounts of time to performing sophisticated computer work that falls within duties described in Section 213(a)(17), and, most importantly, was valuable to Vaticor specifically because of his ability to do so.

In sum, Sarkissian's contention that he does not fall within the computer employee exemption is without merit.  He appears to be precisely the sort of highly skilled, technologically sophisticated and abundantly trained individual that Section 213(a)(17) and 29 C.F.R. § 541.400[7] were designed

---

[7]In his Response Brief, Sarkissian cites to an outdated version of 29 C.F.R. § 541.3, which applied to the general professional exemption, and to 29 C.F.R. § 541.402, which applies to "executive and administrative computer employees." Neither is relevant to the case at hand,

to cover.  Accordingly, the Court will grant summary judgment with respect to Sarkissian's overtime claims under the FLSA.

Sarkissian also states a claim to overtime pay under the Maryland Wage and Hour Law, Md. Code. Ann., Lab. & Empl. §§ 3-401 *et seq.*, ("MWHL").  This Court has determined that, while employed at Vaticor, Sarkissian was an exempt computer employee under the FLSA.  The MWHL contains overtime exemptions which track the language and application of the FLSA.  *See Turner v. Human Genome Scis., Inc.*, 292 F. Supp. 2d 738, 744 (D. Md. 2003) ("The requirements under the MWHL mirror those of the federal law; as such, Plaintiffs' claim under the MWHL stands or falls on the success of their claim under the FLSA."); *see also* Md. Code Regs. 09.12.41.23 (2005) (setting forth wage and overtime regulations for computer employees that are virtually identical to those of 29 C.F.R. § 541.400).  Thus, for the aforementioned reasons, Sarkissian's claim for overtime pay under the MWHL also fails.

### C.     Vaticor's Counterclaims

Vaticor seeks summary judgment on four of its counterclaim, all of them stemming from expense fraud allegedly committed by Sarkissian during the course of his employment.  In particular, Vaticor asserts claims of theft/misappropriation, conversion, unjust enrichment, and breach of contract.  Vaticor claims that Sarkissian abused his corporate credit card and submitted fraudulent expense reports, thereby misappropriating thousands of dollars which he spent on pornography, prostitutes, consumer electronics, food, clothing, and other unauthorized expenses.  Vaticor seeks recovery of funds it transferred to Sarkissian during his employment, as well as monies paid to him at the incipient stages of this litigation in a "good faith" effort to satisfy Sarkissian's claims.

---

over which the "computer employee" exemption, as set forth in 29 U.S.C. § 213(a)(17) and  29 C.F.R. § 541.400, is controlling.

In support of its allegations, Vaticor submits the affidavit, deposition testimony, and report of Joseph Cseh ("Cseh"), a Colorado police officer trainee and personal acquaintance of Mark Anthony, Vaticor's President and Chief Operating Officer. After conducting a review of Sarkissian's credit card statements, receipts, and expense reimbursement forms, Cseh determined that Sarkissian "submitted and received payment for invalid expenses totaling at least $35,602." (Cseh Dec. ¶ 28.) Cseh prepared a ten-page report summarizing the allegedly fraudulent expenses. (Def.'s Mot. for Summ. J., Ex. 25.)

In response, Sarkissian argues that Cseh's testimony and report are inadmissible because they constitute hearsay and because "[h]owever slanderous and however salacious Mr. Cseh's imagination might be, he is not competent to testify as to matters he has no personal knowledge of." (Pl.'s Opp. at 13.) Sarkissian also asserts, in a sworn affidavit, that he never intentionally used Vaticor's credit cards for personal use. He acknowledges that although "[t]here were times [he] messed up his expense account . . . those were all settled with Vaticor prior to the filing of this suit." (*Id*.) Sarkissian, however, offers no detailed rebuttals to the specific charges made by Vaticor.

Upon consideration of the evidence, the Court believes that material facts relating to these claims remain in significant dispute, such that summary judgment is inappropriate at this time. Liability on all these counterclaims centers largely on the issue of intent; i.e., did Sarkissian knowingly submit fraudulent expense reports in an effort to misappropriate Vaticor's funds? Accepting the truth of Sarkissian's assertion that he at all times acted in good faith, as is required at this stage of the proceeding, precludes the Court from finding that Sarkissian is liable as a matter of law.

Vaticor correctly notes that "even one who acted in good faith and lacked any consciousness

of wrongdoing" may have the requisite intent for the tort of conversion, "as long as there was an intent to exert control over the property." *Darcars Motors of Silver Spring, Inc. v. Borzym*, 379 Md. 249, 262 (Md. 2004).  Even so, Vaticor must still demonstrate a "distinct act of ownership or dominion exerted by one person over the physical property of another in denial of his right or inconsistent with it." *Id.* at 261 (internal citations and quotation marks omitted).  The "gist" of conversion is the "*wrongful* deprivation of a person of property to the possession of which he is entitled." *Id.* (emphasis added).  This Court harbors significant doubts as to the admissibility of the evidence submitted by Vaticor to demonstrate the wrongfulness of Sarkissian's conduct.  Vaticor relies entirely on the testimony and report of Joseph Cseh; Cseh is not, however, a forensic accountant or expert in financial fraud.  Instead, he is a "personal friend" of Vaticor President Mark Anthony, with no license as an investigator, no background in accounting, and no apparent experience in conducting investigations of this type. (Cseh Dep. at 8, 44-45.)  Furthermore, his testimony is based largely on documents submitted to him by Vaticor, not on personal knowledge.  Accordingly, for the reasons stated above, the Court will deny summary judgment with respect to Vaticor's counterclaims.

## IV.     CONCLUSION

For the aforementioned reasons, Defendant's Motion for Summary Judgment will be DENIED with respect to Plaintiff's claim for vacation pay and GRANTED with respect to all other claims asserted by Plaintiff in his Complaint. With respect to Defendant's counterclaims, the Motion for Summary Judgment will be DENIED.  An Order consistent with this Opinion will follow.

November 29, 2005                                    /s/
                                                                Alexander Williams, Jr.
                                                                United States District Judge